1348

CAROLINA BUSINESS BROKERS, d/b/a Sunbelt Business Brokers, Respondent v. George C. STRICKLAND, Appellant.

(384 S. E. (2d) 72)

Court of Appeals

*Philip A. Middleton,* and *Thomas J. Wills, IV,* and *Robert A. Patterson,* both of *Barnwell, Whaley, Patterson & Helms,* Charleston, *for appellant.*

*Robin L. Hitchcock,* of *Brock & Hitchcock,* Charleston, *for respondent.*

Heard April 12, 1989.

Decided June 5, 1989.

SHAW, Judge:

Respondent, Carolina Business Brokers, d/b/a Sunbelt Business Brokers (hereinafter Sunbelt), sued appellant, George C. Strickland, for payment of a broker's commission under the terms of a listing agreement entered into between the parties. The master found for Sunbelt awarding a $40,000 commission and attorney's fees. Strickland appeals. We reverse.

This being a case at law, the facts must be viewed in the light most favorable to Sunbelt. The findings of fact of the master will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's finding. *May v. Hopkinson*, 289 S. C. 549, 347 S. E. (2d) 508 (Ct. App. 1986).

On May 8, 1985, Strickland, the owner of an insurance agency in Charleston, South Carolina, signed a listing agreement with Sunbelt. The agreement provided an expiration date of November 11, 1985. On November 2, 1985, one of Sunbelt's agents, Edward Pendarvis, met with Mr. Robert Bring to discuss the Strickland Agency. Pendarvis was introduced to Bring through another Sunbelt agent, Michael DeSantis. On that date, Bring signed a Confidentiality Agreement concerning the Strickland Agency. This document was later sent to Strickland on November 6, 1985. At that time, Strickland signed an agreement to extend the listing agreement until January 1, 1986. In the following months, negotiations for the sale of the Strickland Agency ensued with Strickland, Pendarvis, Bring and DeSantis present during the meetings. An offer to purchase, signed by Bring on December 31, 1985 was presented to Strickland. The offer to purchase contained the full purchase price of $650,000, the same as that contained in the listing agreement. The offer to purchase also listed four contingencies to which the contract was subject. The four contingencies included Bring's approval of the year-end financials, Bring's review and approval of the leasing arrangement, Bring's and Strickland's agreement on a management contract, and Strickland's signing of a noncompete agreement. On Janu-

ary 3, 1986, Strickland signed the offer to purchase and Bring agreed to draw up a proposed management contract.

Review of the year-end financials and a managerial contract acceptable to both Strickland and Bring were two points of concern. Bring considered the matters yet to be resolved as very important to the contract. In particular, a managerial contract to be agreed upon between Strickland and Bring was crucial to the sale of the business as Bring was a novice in the insurance business and needed Strickland to help manage the business for some time. Bring needed a good working relationship with Strickland in order for the venture to be successful.

After Strickland signed the offer to purchase, a meeting was set up for January 28, 1986 at which time Bring would present the management contract and Strickland's accountant, Jack Peterson, would attend and present the year-end financial statement. This meeting was cancelled due to the illness of the accountant. However, Strickland and Bring met to play golf that day without the knowledge of Sunbelt. During the golf outing, Strickland and Bring discussed matters relevant to the purchase of the agency. The subject of the salary Bring was to pay Strickland under the management contract was discussed. Strickland testified he told Bring that he would not work for him for only $24,000 a year and "that just sort of tabled it right there." Bring then asked Strickland, "Do you really want to sell your business?" to which Strickland replied, "No, not really." Bring did not present the management contract to Strickland at the golf outing.

Subsequently, Bring became concerned that a final agreement could not be reached and he telephoned DeSantis informing him he wanted his deposit back. Shortly thereafter, DeSantis returned Bring's deposit check. Strickland and Pendarvis met to discuss the situation and Strickland later contacted Pendarvis and requested a meeting with Bring to discuss the management contract. Pendarvis did not participate in further negotiation.

Sunbelt brought suit against Strickland alleging three separate causes of action: breach of contract, quantum merit, and unfair trade practices. The master directed a verdict for Strickland on the unfair trade practices cause of

action and found for Sunbelt for breach of contract. He did not address the quantum merit cause of action. Thus, this court is faced with the question of whether the master erred in finding Sunbelt was entitled to a commission based on a breach of contract committed by Strickland.

The master's order cites the South Carolina case of *Bishop Realty and Rentals, Inc. v. Perk, Inc.*, 292 S. C. 182, 355 S. E. (2d) 298 (Ct. App. 1987) for the general proposition that, unless otherwise agreed, a broker earns his commission when the seller accepts a buyer procured by the broker and a contract of sale is entered. However, in the case of *Bishop Realty* and the case of *Thomas-McCain, Inc. v. Siter*, 268 S. C. 193, 232 S. E. (2d) 728 (1977) on which *Bishop Realty* is based, the court noted the sales contracts involved contained language indicating the commission had already been earned. Thus, the language in the contract entitled the broker to receive his commission regardless of whether the sale was consummated. This reasoning is based on the case of *Hamrick v. Cooper River Lumber Co.*, 223 S. C. 119, 74 S. E. (2d) 575 (1953) wherein our Supreme Court held where a contract of sale provided the broker was to be paid "on the date of settlement," these words were intended to make liability for the payment of the commission contingent upon payment of the purchase price and closing of the transaction. Where the obligation of the principal to pay the commission depends on the performance of conditions precedent, the broker takes the risk of nonperformance on the part of the customer. *Thomas-McCain*, supra, at 729.

The question of whether Sunbelt's commission had been earned prior to closing or whether payment was dependent upon payment of the purchase price and closing was never addressed by the master. Further, DeSantis testified at the hearing that the commission is earned *if* the deal goes through to closing. He also stated the commission is not paid when there is no closing unless the seller is in default of the listing agreement. Thus, the question becomes whether Strickland was liable for the commission based on his default under the listing agreement.

It is undisputed the written listing agreement between Strickland and Sunbelt expired on November 8, 1985. However, it was extended by agreement of the parties until

January 1, 1986. While the offer to purchase was signed by Bring on December 31, 1985, it was not accepted by Strickland until January 3, 1986, after the expiration of the extension. Thus, it is questionable whether the terms of the written listing agreement were still in force or whether the continued negotiations merely entitled Sunbelt to a commission if the sale were indeed consummated. However, even assuming the written listing agreement was still in force and Strickland was therefore subject to its terms, we find the master erred in finding Strickland was in default under the agreement.

The listing agreement between the parties provides as follows:

> Seller agrees that if this listing is cancelled[1] or the property withdrawn from sale during the listing term by Seller, the commission shall become immediately due by Seller to Broker. If Seller refuses or is unable to comply with the listing terms for any reason, thereby preventing disposition of the property during the listing term upon the terms set forth above, the commission shall become immediately due by the Seller to the Broker.

The master held that Strickland's "informing [Bring] that he did not want to sell his business and his failure to provide the year-end financials for review by [Bring] constitute a withdrawal of his business from sale and a refusal to comply with the terms of the Listing Agreement. . . ." We hold there is no evidence which reasonably supports this holding and hold as a matter of law that no actions on the part of Strickland amounted to a withdrawal of his business or refusal to comply with the terms of the agreement.

The testimony of both Bring and Strickland demonstrate that the parties had not entered a binding contract in that several contingencies remained to be consummated. Not only did Bring and Strickland testify as to the importance of these contingencies, Pendarvis and DeSantis confirmed they were crucial to the deal. The evidence clearly demonstrates that Strickland never withdrew his business from sale. He

---

[1] Sunbelt admits the listing was never cancelled.

never stated that he was unwilling to sell his property according to the terms of the listing agreement. Strickland simply relayed his feelings in response to Bring's question of whether he really *wanted* to sell his property. In fact, Bring testified that he asked for his deposit back because, "I did not feel that we could consummate a deal at that point in time." He further stated that he could not say Strickland's reluctance made the consummation of the contract impossible. While Sunbelt asserted Strickland unilaterally cut off the deal, broker DeSantis admitted that was merely an assumption on his part. We find there is no evidence which shows Strickland made a unilateral decision such as would amount to a withdrawal of his property. The record shows Strickland and Bring never reached a meeting of the minds as they were unable to agree on all of the contingencies, in particular the management contract. At the most, the contract failed to close as a result of the mutual agreement between Strickland and Bring.[2] The failure to provide any financial statements due at that point is irrelevant. We hold the contingencies contained in the offer to purchase were never met resulting in the failure of closing. We further find there is no evidence in the record which supports the master's finding that Strickland withdrew his business from sale and refused to comply with the listing agreement in contravention of the listing agreement.

The order is therefore reversed.

SANDERS, C. J., and LITTLEJOHN, Acting Judge, concur.

---

[2] We note that Strickland testified he did not consider negotiations were closed as a result of the golf outing. Further the record shows Strickland later requested that Pendarvis had Bring present the management contract.